IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

IN RE: INFANT FORMULA MULTIDISTRICT
LITIGATION

CASE NO. 4:91-cv-00878-MP

_____/

**O R D E R**

This matter is before the Court *sua sponte*. At the conclusion of this multi-district litigation case, and after all claims had been paid, a sum of money remained. By order of this Court dated February 11, 2000 (doc. 701), these funds were ordered to be deposited into an interest bearing account in the registry of this Court and were to be distributed by this Court in accordance with the *cy pres* doctrine. No party in interest appealed that order. Throughout the years, this Court has periodically revisited this matter in an effort to determine what entity or entities should be the beneficiary of these funds. In light of the devastation visited upon the states and citizens of Florida, Alabama, Mississippi and Louisiana by Hurricane Katrina within the past days, I have determined that these funds can best be allocated consistent with the *cy pres* doctrine for use by the American Red Cross Disaster Relief Fund in alleviating the pain and suffering of, and furnishing some of the basic human needs of, the victims of Hurricane Katrina.

The *cy pres* doctrine takes its name from the Norman French expression, "*cy pres comme possible*", which means "as near as possible." In re Airline Ticket Comm'n Antitrust Litig., 268 F.3d at 625 (citing Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n, 84 F.3d 451, 455 n. 1 (D.C.Cir.1996)). The doctrine originated to save testamentary charitable gifts that would otherwise fail. See Note, Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U. Chi. L. Rev. 448, 452 (1972). Under *cy pres*, if the testator had a general

charitable intent, the court will look for an alternate recipient that will best serve the gift's original purpose. See id.

The *cy pres* doctrine, however, has been used in the class action context as well.  For example, the Eighth Circuit has held that it may be appropriate for a court to use *cy pres* principles to distribute unclaimed funds.  In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.  In re Airline Ticket Com'n Antitrust Litigation, 307 F.3d 679, 682 (8th Cir. 2002).

In Nelson v Greater Gadsden Housing Authority, 802 F2d 405 (11th Cir. 1986), the Eleventh Circuit also expressly approved such a *cy pres* distribution.  In Nelson, the suit involved whether a city was required to pay utility allowances to tenants of public housing.  Later, after various attempts at distributing the compensatory damages award, the Court entered an order directing that "any compensatory damages which are not claimed within a specified time limitation are to be used by Greater Gadsden to increase the energy efficiency of the apartment units or to improve the defendant-supplied appliances within the units."  The Eleventh Circuit approved the distribution, even though the energy efficiency of the units is only tangentially related to the issues in the suit, utility allowances.

In Powell v. Georgia-Pacific Corporation, 119 F.3d 703 (8th Cir.1997), the Eighth Circuit approved a *cy pres* distribution that is also instructive in this case.  Powell involved a class of African American workers who alleged the Georgia-Pacific Corporation had violated their rights under Title VII. Id. at 704.  After the class members were compensated, nearly $1 million in settlement funds remained. Id. at 704-05. Rather than distribute the remaining funds to

class members, the district court ordered the parties to design a scholarship program to be administered by the Georgia-Pacific Foundation. Id. at 705. Under the program, scholarships were to be awarded over ten years to 112 African American high school students in the three counties in Arkansas and three parishes in Louisiana where most of the class members lived, with the remaining proceeds going to the United Negro College Fund. Id. Not only did the scholarship program carry out the plaintiffs' desire to have scholarships benefit their younger relatives, it addressed the subject matter of the lawsuit-the employment opportunities available to African Americans living near Georgia-Pacific's facilities in Cosset, Arkansas. See id. at 706-07; Powell v. Georgia-Pacific Corp., 843 F.Supp. 491, 494 (W.D.Ark.1994). The Eighth Circuit affirmed, even though educational opportunities of future students is only lightly related to the Title VII violations alleged in the case.

Judge Thrash in the Northern District of Georgia, in In re Motorsports Merchandise Antitrust Litigation, 160 F.Supp.2d 1392 (N.D.Ga.,2001), applied the *cy pres* doctrine in a similar manner, after stating the following:

> Where settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward "combating harms similar to those that injured the class members. Such a donation may serve the cy pres principle of indirectly benefitting all class members." Jones v. National Distillers, 56 F.Supp.2d 355, 358 (S.D.N.Y.1999); see also, West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970). Courts have expanded the cy pres doctrine to also permit distributions to charitable organizations not directly related to the original claims. Superior Beverage Co. v. Owens-Illinois, 827 F.Supp. 477, 478-79 (N.D.Ill.1993). "The absence of an obvious cause to support with the funds does not bar a charitable donation." Jones, 56 F.Supp.2d at 359. Although the "use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and the courts' broad equitable powers now permit the use of funds for other public interest purposes by educational, charitable, and other public service organizations."

Id. at 1394.

The undersigned finds that the *cy pres* doctrine can be similarly applied to this case, to the benefit of the victims of Hurricane Katrina. The instant case began when direct purchasers of infant formula across the nation filed myriad suits alleging a conspiracy on the part of three companies which controlled 95% of the infant formula market "to fix, raise, maintain, and stabilize the prices of infant formula ... in violation of Section One of the Sherman Act, 15 U.S.C. § 1." The case was eventually settled, and pursuant to an order of January 5, 1995, over $91,000,000 was mailed to all approved claimants. The 1995 order also set aside a contingency fund of $940,000. From 1995 to 2000, extensive efforts were made to locate and pay any additional claimants, but as of February, 2000, $1,010,073.17 unclaimed funds remained. Finally, in an order dated February 11, 2000, this Court, after directing that certain expenses be paid from the contingency funds, entered an order declining to distribute the remaining funds pro rata to the class. Instead, the Court indicated it would "employ its power under the equitable doctrine of cy pres to distribute the residue of the class settlement fund to an alternate recipient."

The complaint in this case therefore alleged injury to consumers of infant formula, through alleged unfair pricing. Likewise, one of the challenges faced by rescue workers in the areas affected by Hurricane Katrina is providing essential food and drink to the victims of the storm. In fact, the provision of infant formula is one of the chief priorities of rescue officials. See Associated Press, *Washington moves to help Katrina's victims* (Aug. 30, 2005), *available at* http://www.cnn.com/2005/WEATHER/08/30/katrina.washington.ap/ ("The Agriculture Department said its Food and Nutrition Service would provide meals and other commodities, such as infant formula, distilled water for babies and emergency food stamps"); Department of Homeland Security, *Hurricane Katrina: What Government Is Doing* (Sept. 6, 2005), *available at*

http://www.dhs.gov/interweb/assetlibrary/katrina.htm ("Additionally, four trucks of baby food products were ordered for immediate shipment.  One truck of infant formula will arrive in Baton Rouge today. The other three trucks of baby food products are on the way.").  Thus, a donation to the American Red Cross, which coordinates the delivery of such essential products to the victims of the hurricane, will be geared toward "combating harms similar to those that injured the class members."  Indeed, the Court finds that the relationship between the nature of the underlying suit and the putative use of the funds is as strong or perhaps stronger in the instant case than it was in <u>Nelson</u>, <u>Powell</u>, or <u>Motorsports Merchandise</u>.  Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

The Clerk of this Court is ordered and directed to write a check, drawn on the funds in the registry account, made payable to the "American Red Cross Hurricane Katrina Disaster Relief Fund", in the amount of SEVEN HUNDRED THOUSAND DOLLARS.  The check should indicate thereon that this money is not from any public funds.

**DONE AND ORDERED** this  *8th*  day of September, 2005

*s/Maurice M. Paul*
Maurice M. Paul, Senior District Judge

*Case No: 4:91-cv-00878-MP*